1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jennifer L. Keller (SBN 84412)
jkeller@kelleranderle.com
Chase Scolnick (SBN 227631)
cscolnick@kelleranderle.com
**KELLER ANDERLE SCOLNICK LLP**
18300 Von Karman Ave., Suite 930
Irvine, California 92612
Telephone:    (949) 476-8700
Facsimile:    (949) 476-0900

Attorneys for Plaintiff
GUARDANT HEALTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GUARDANT HEALTH, INC., a Delaware corporation,

                Plaintiff,

vs.

NATERA, INC., a Delaware corporation; ALAN SELEWA, an individual; CATALIN BARBACIORU, an individual; and DOES 1 through 50, inclusive,

                Defendants.

Case No. _____

**GUARDANT HEALTH, INC.'S COMPLAINT FOR:**

**(1) MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)**
**(2) MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT (Cal. Civ. Code, §§ 3426 *et seq.*)**
**(3) BREACH OF CONTRACT (SELEWA)**
**(4) BREACH OF CONTRACT (BARBACIORU)**
**(5) TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(6) INDUCING BREACH OF CONTRACT**

**JURY TRIAL DEMAND**

Plaintiff Guardant Health, Inc. ("Guardant") files this Complaint against Defendant Natera, Inc. ("Natera"), Alan Selewa ("Selewa"), Catalin Barbacioru ("Barbacioru"), and Does 1 through 50, inclusive ("Does") (collectively, "Defendants"), and in support thereof alleges as follows:

## I.    **INTRODUCTION**

1.    The World Health Organization lists cancer as a leading cause of death worldwide.[1] The fight against cancer is profound and multifold. Since 2012, Guardant Health has been at the forefront of this fight and is the leading provider of blood tests that comprehensively analyze circulating tumor DNA (ctDNA) for early detection of cancer, recurrence monitoring, and therapy selection. Guardant has developed and commercially released groundbreaking technology in this space, including tests that can detect cancer in a matter of days based on a simple blood draw. These oncology tests offered by Guardant—including Guardant 360, Guardant 360 CDx, GuardantOMNI, Reveal, and Shield—help save lives and lower healthcare costs.

2.    One of the critical front lines in the fight against cancer is early detection. Patients achieve far better outcomes the earlier they and their doctors can detect and identify cancer so a course of treatment or intervention can be implemented. Catching cancer early can be the difference between life and death. Guardant has blazed the trail for early cancer detection and developed Shield, the first blood test approved by the FDA as a primary screening option for colorectal cancer.

3.    Besides its comprehensive team of scientists, engineers, and doctors, Guardant's success is directly attributable to the proprietary, highly sensitive, and trade secret technology and data it develops in creating its revolutionary tests for clinical use. These trade secrets include unique technology, vast data sets, scientific research, advanced analytics, and computer source code. This technology, data, analytics, and source code is to Guardant what the formula for Coke is to Coca-Cola – a quintessential example of a trade secret. Like Coke's formula, Guardant's trade secrets are proprietary technology and information that have taken substantial time, money, resources, and efforts to develop. These trade secrets form the backbone of Guardant's business,

---

[1]    https://www.who.int/news-room/fact-sheets/detail/cancer#:~:text=Key%20facts,nearly%20one%20in%20six%20deaths, last accessed February 19, 2025.

have substantial economic value from not being known to the public or competitors, and are used in the years-long process of developing life-saving testing products.

4.      Guardant's success has sparked jealousy from its competitors who have been unable to develop early cancer blood tests comparable to Guardant's.  Natera is one such competitor.  The commercial and clinical success of Guardant's early cancer detection blood tests has left Natera playing catch-up.

5.      Unable to compete fairly, Natera recently turned its focus on not only poaching Guardant's employees but stealing Guardant's trade secrets.  Natera launched a campaign of aggressively targeting and recruiting bioinformatic scientists, in particular those working at Guardant.  Only a handful of Guardant scientists have defected to Natera, including Selewa and Barbacioru.  But Natera's illicit scheme goes beyond merely trying to build up its own team to develop its own technology through legitimate means.  The former Guardant employees that Natera has lured away in recent weeks have taken Guardant's trade secrets with them on their way out the door to Natera.

6.      Through a forensic analysis performed shortly after Selewa's and Barbacioru's departures, Guardant discovered that Selewa and Barbacioru collectively transferred over 6,500 critical trade secret files out of Guardant's IT systems, without authorization or notice.  They did so despite signing multiple explicit written agreements with Guardant representing they would protect, secure, and not take any of Guardant's trade secrets.  The surreptitiously copied files pertain to testing technologies Guardant has developed and released, and new innovative technologies currently in development.  Barbacioru even took files for Guardant projects and products on which he never worked.  The goal of this scheme is obvious, and illegal—Natera wants Guardant's trade secrets.

7.      Guardant employs a dedicated and highly-valued team of scientists, doctors, researchers, engineers, and other staff.  Guardant does not relish having to bring this litigation or sue two of its former employees.  But the magnitude of Selewa's and Barbacioru's conduct, and their entanglement in Natera's scheme to take Guardant's Trade Secrets, leave Guardant little choice.  This threat to Guardant's business is serious and cannot be overstated.  If its former

employees and competitors are able to take the trade secrets Guardant has spent years and millions of dollars to develop, it cannot design, develop, and release its early cancer detection technologies and other products.

8.    By this action, Guardant seeks the return of all the trade-secret information taken by Defendants, the Defendants' complete dispossession of such trade secret information, other injunctive relief to prevent any further harm caused by Defendants' misconduct, and compensatory, exemplary, and other damages.

## II.    **THE PARTIES**

9.    Plaintiff Guardant is a Delaware corporation with its principal place of business at 3100 Hanover St., Palo Alto, California 94304.  Guardant was founded in 2012 by pioneers in DNA sequencing and cancer diagnostics.  Since its inception, Guardant has focused its expertise on developing liquid biopsy assays for cancer.  Guardant was the first company to develop and commercialize a liquid biopsy assay to identify genomic biomarkers for advanced solid tumors using cell-free ctDNA, from simple, non-invasive blood draws.

10.    Defendant Natera is a Delaware corporation having its principal place of business at 13011 McCallen Pass, Building A, Suite 100, Austin, Texas 78753, and offices at 201 Industrial Road, San Carlos, California 94070.

11.    Defendant Alan Selewa is an individual who resides in California.  He was employed by Guardant from September 2022 until January 17, 2025.  Selewa initially worked at Guardant's San Diego office, but he later moved to Fremont, California and worked primarily in Guardant's Palo Alto location until his departure from the company.  Guardant is informed and believes and thereon alleges that Selewa became employed by Natera upon his departure from Guardant.

12.    Defendant Catalin Barbacioru is an individual who resides in California.  He was employed by Guardant from September 2017 until February 7, 2025, working primarily in its Palo Alto location.  Guardant is informed and believes and thereon alleges that Barbacioru became employed by Natera upon his departure from Guardant.

13.    Defendant Does 1 through 50, inclusive, are sued herein under fictitious names.

1    Their true names and capacities are unknown to Guardant at this time.  Guardant is informed and

2    believes, and based thereon alleges, that each of the fictitiously named Doe defendants is legally

3    responsible in some manner for the events, acts, occurrences, and liabilities alleged and referred to

4    herein.  Guardant will seek leave to amend this Complaint to state the true names and capacities of

5    said defendants when ascertained and as necessary.    Any reference in this Complaint to

6    "Defendants" shall include each and every Doe defendant.

7              14.    Guardant is informed and believes, and based thereon alleges, that at all times

8    material to this Complaint, each of Defendants, besides acting for himself, herself, or itself, and on

9    his, her, or its own behalf individually, is and was acting as the agent, servant, employee and/or

10   representative of, and with the knowledge, consent and permission of, each and all of Defendants

11   within the course, scope, and authority of that agency, service, employment, and/or representation.

12   Guardant further alleges on information and belief that the acts of each of Defendants were ratified

13   by each and all of Defendants.

14   **III.    <u>JURISDICTION AND VENUE</u>**

15              15.    This is an action for misappropriation of trade secrets under the Defend Trade

16   Secrets Act (18 U.S.C. § 1836) and other wrongdoing.  This Court has original subject matter

17   jurisdiction over this action under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

18              16.    This Court has supplemental jurisdiction over Guardant's state law claims under 28

19   U.S.C. § 1367.

20              17.    The exercise of personal jurisdiction in California is proper both because of

21   Defendant Natera's ongoing and systematic contact with California and the Northern District of

22   California, including its maintenance of a regular place of business in the District, and because acts

23   giving rise to Guardant's causes of action have occurred in the Northern District of California.

24   Further, Defendants Selewa and Barbacioru reside in the District and worked in the District while

25   at Guardant.

26              18.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391.

27

28

1    **IV.    FACTUAL BACKGROUND**

2        **A.    Guardant's Early Cancer Detection Blood Tests And Trade Secrets**

3        19.    Guardant is a leading precision oncology company dedicated to helping conquer

4    cancer with data obtained through its proprietary blood tests.    Through its expertise and

5    groundbreaking technology, Guardant has developed liquid biopsy cancer tests, including

6    Guardant360 CDx, the first FDA-approved liquid biopsy test.    Guardant's liquid biopsy tests help

7    improve patient outcomes across all stages of cancer, including screening to find cancer early,

8    monitoring for recurrence in early-stage cancer, and helping oncologists select the best treatment

9    for patients with advanced cancer.

10        20.    At its most basic level, cancer is a group of abnormal cells that divide and grow

11    uncontrollably.    These abnormal cancer cells form a tumor which grows and spreads absent

12    intervention.    As tumors form and develop, they shed cell fragments into the blood, known as

13    ctDNA (circulating tumor DNA).    Guardant's liquid biopsy technologies identify this ctDNA with

14    a simple blood draw.

15        21.    In May 2022, Guardant commercially released a revolutionary test entitled,

16    "Shield," which is a blood test that can detect early colorectal cancer (CRC) through even routine

17    doctor/patient interactions, such as at an annual physical exam.    Shield was groundbreaking in the

18    health industry and received wide praise.    In 2024, Shield became the first FDA-approved early

19    cancer blood test.

20        22.    The development of a cancer-screening blood test like Shield does not occur

21    overnight.    It requires a tremendous commitment to and expenditure of time, resources, expertise,

22    and research to develop.    This includes research aimed to locate, identify, and classify ctDNA

23    markers in the blood, and the development of sophisticated computer source code and testing

24    apparatuses that can identify and deliver accurate results from a blood sample.    For example,

25    Guardant's Shield test took years and millions of dollars to develop and bring to market throughout

26    the country.

27        23.    Following the success of Shield, Guardant has worked to develop an even more

28    comprehensive and revolutionary early cancer blood test—a multi-cancer classifier and cancer of

origin identifier for screening use. In its development stage, Guardant refers to this project as MCD (multi-cancer detection) or MCED (multi-cancer early detection) test. This test would be able to detect and identify unique markers in the ctDNA found in a blood sample that would allow clinicians to identify the type of cancer and the location of the tumor in the patient. This would be a game changer for the medical industry. When paired with Guardant's Shield technology, an MCD/MCED test would allow patients to determine from a routine blood draw at an annual exam whether they have any early indication of numerous forms of cancer and, if so, the origin of the cancer.

24.    As a critical component of its business, and in its development and maintenance of Shield, MCD/MCED, and other liquid biopsy tests, Guardant creates, owns, and maintains a substantial amount of confidential, proprietary, and trade secret information, data, and technology (collectively, the "Trade Secrets"). Guardant's Trade Secrets include but are not limited to:

a.    Proprietary computer software, systems, and data used to determine, update, and maintain validations for sample testing, including proprietary knowledge and calculations for determining sample types, dilution approaches, acceptance criteria, and other factors used to calibrate testing conditions and factors affecting accuracy of testing;

b.    Proprietary research, data, summaries, results, algorithms, and similar internal specifications for probes and probe testing, which are used for virtually all of Guardant's products to (1) help identify the region or regions of the genomes being examined in developing accurate testing, which occurs through time-consuming and expensive work including trial and error, (2) create "blacklists" denoting problematic regions of the genome that require further investigation and research, and (3) identify filters for Guardant's algorithms to address those "blacklists" and help identify biomarkers within the genomes;

c.    Internal source code used in Guardant's algorithms that are developed to permit a blood test to operate successfully, *e.g.*, algorithm instructions triggering the test to identify biomarkers indicative of early cancer in the blood genome being tested; and

d.    Internal descriptions, data, presentations, summaries, and compilations describing how Guardant's testing applications and callers (*i.e.*, triggers for identifying the

condition being tested) work and operate and, importantly, those that were tested and developed but did not work or operate sufficiently.

25.     These Trade Secrets are the lifeblood of Guardant.  They lay out the design, research and development, test methods and results, quality and accuracy assurances, and source code processes of its cancer-detecting blood tests.  If disclosed to a competitor or other third party, they would understand how Guardant's tests work, what progress it has made on developing successful tests, what works and what does not work, and how to implement and commercialize that knowledge base into useful testing apparatuses.

26.     Guardant takes substantial efforts to ensure the confidentiality and privacy of its Trade Secrets.  It closely protects and guards its Trade Secrets by ensuring they are only accessible to those working on a designated project or with a legitimate company need.  Guardant's IT systems are secured in such a way as to limit access to its Trade Secrets and protect against any untoward or suspicious activity regarding those Trade Secrets.  Guardant's efforts to protect its Trade Secrets include (a) physical, online, and other electronic security features to ensure confidential and proprietary documents and information cannot be accessed by any unauthorized person or entity; (b) dissemination of Trade Secret information only on an "as needed" basis; and (c) ensuring all employees or agents with access to the Trade Secrets agree to maintain their confidentiality, most often in a written confidentiality agreement.

27.     Guardant's Trade Secrets identified above are compiled, created, derived, organized, developed, and/or implemented on an ongoing basis and only as a result of tremendous effort and expense.  These Trade Secrets create independent economic value for Guardant, both actual and potential, from not being generally known to the public, to competitors, or to others who could otherwise disclose or use them for their own economic benefit.  Any unauthorized use or disclosure of Guardant's Trade Secrets—especially to its competitors—compromises and jeopardizes Guardant's ability to effectively design, develop, and release testing kits and other products to the public and for commercial use.

**B.     Natera Targets Guardant's Employees and Trade Secrets**

28.     Guardant's success with Shield and its continuing work on MCD/MCED have not

1    gone unnoticed by its competitors, none of whom have been able to develop comparable

2    technology. Natera views itself as a competitor of Guardant in the early cancer test space but has

3    been unable to develop its own equivalent cancer screening test to compete with Guardant's

4    products.

5        29.    As a result, Natera has begun to target and recruit Guardant's employees

6    aggressively in an effort to jumpstart its lagging position in the early cancer test industry. Natera's

7    desperation has led it to brazenly employ unfair and illegal tactics, including attempting to lure

8    Guardant employees to bring over Guardant's highly sensitive and proprietary Trade Secrets to

9    Natera. Unable to develop a competitor to Guardant's early cancer detection technology through

10   legitimate competition, Natera now aims to poach Guardant's employees and have them

11   surreptitiously provide Natera with Guardant's protected Trade Secrets.

12       30.    Among those Guardant employees Natera recently targeted and hired are Alan

13   Selewa and Catalin Barbacioru. Both Selewa and Barbacioru recently left Guardant for Natera,

14   and the computer investigation and audit Guardant performed conclusively prove each took

15   Guardant's Trade Secrets with them.

16       31.    Selewa began at Guardant in September 2022 with the title of Senior Bioinformatics

17   Scientist II and later was promoted to Senior Bioinformatics Scientist. After starting at Guardant,

18   Selewa worked on Guardant's Shield product—which had recently been commercially released—

19   and devoted substantial time to Guardant's work to develop MCD/MCED tests. Selewa abruptly

20   resigned in January 2025, with his last day on or about January 17, 2025.

21       32.    Barbacioru began at Guardant in or around September 2017 with the title of

22   Associated Director of Bioinformatics. He later was promoted and held the title of Director of

23   Bioinformatics at the time of his departure. Barbacioru's last day at Guardant was February 7,

24   2025. Like Selewa, Barbacioru worked on Guardant's oncology products and other cutting-edge

25   technology.

26       33.    Before being hired by Guardant, and as a condition of their employment, Selewa

27   and Barbacioru signed written confidentiality agreements with Guardant. When each were offered

28   positions at Guardant, the respective offer letters provided that their acceptance of the job offer and

commencement of employment was contingent on executing and delivering to Guardant a copy of the company's Confidential Information and Invention Assignment Agreement ("CIIAA"), which was attached to the offer letters. Each signed the CIIAA, and such CIIAAs remained in effect throughout their employment with Guardant.

34.     Selewa's and Barbacioru's defections in the last few days and weeks follow Natera's recruitment and hiring in recent months of three other bioinformatic scientists who had worked at Guardant. First, Princy Parsana ("Parsana"), who held the title of Senior Bioinformatics Scientist at the time of her departure from Guardant, was employed by Guardant from approximately July 2020 until August 1, 2024, when she left for Natera. Second, Sofia Medina Ruiz ("Ruiz"), who held the title of Bioinformatics Scientist II-S at the time of her departure from Guardant, was employed from approximately February 2022 until November 12, 2024. Third, Swati Goyal ("Goyal"), who held the time of Associate Director of Bioinformatics for SW Engineering at the time of his departure, was employed by Guardant from approximately April 2022 until November 15, 2024, when he left for Natera.

## C.     Selewa's Confidentiality Agreement With Guardant

35.     On September 16, 2022, Selewa signed his Employee Confidential Information and Invention Assignment Agreement ("Selewa CIIAA") with Guardant. Section 1(b) of the Selewa CIIAA states:

> (b)     **Company Confidential Information**. I agree at all times in perpetuity to hold all Confidential Information in confidence and to not disclose, use, copy, publish, summarize, or remove from the premises of the Company any Confidential Information, except (a) as necessary to carry out my assigned responsibilities as a Company employee, and (b) after termination of my employment, only as specifically authorized in writing by an officer of the Company. I agree to take all reasonable measures to protect the Confidential Information of the Company from falling into the public domain or the possession of persons other than those persons authorized to have any such Confidential Information. Nothing in this Agreement shall prohibit me from disclosing Confidential Information of the Company if legally required to do so by judicial or governmental order or in a judicial or governmental proceeding ("Required Disclosure"); provided that I shall (i) give the Company prompt notice of such Required Disclosure prior to disclosure; (ii) cooperate with the other party in the event that it elects to contest such disclosure or seek a protective order with respect thereto, and/or (iii) in any event only disclose the exact Confidential Information, or portion thereof, specifically requested by the Required Disclosure.

36.     Section 1(a) of the Selewa CIIAA defines "Confidential Information" as "all

1    information and materials that are confidential, secret, or proprietary (whether or not technical in

2    nature) related to any aspect of the business of the Company," and includes "inventions,

3    innovations, improvements, research or development activities and plans, test results, product

4    specifications, disclosures, processes, systems, methods, formulae, devices, patents, patent

5    applications, trademarks, intellectual properties, instruments, materials, products, patterns,

6    compilations, programs, techniques, sequences, designs, specifications, computer programs, source

7    codes, mask works, . . . and any and all information concerning the teaching of sales, marketing,

8    and operational techniques, marketing and purchasing formulae, development of product designs,

9    pre-manufacturing product designs, and formats."

10    37.    Section 4 of the Selewa CIIAA states:

11    **4.    RETURNING COMPANY DOCUMENTS**

12    I agree that, at the time of leaving the employ of the Company, I will deliver to the
     Company (and will not keep in my possession or deliver to anyone else) any and all
13    devices, records, data, notes, reports, proposals, lists, correspondence,
     specifications, drawings, blueprints, sketches, materials, equipment, other
14    documents or property, or reproductions of any aforementioned items belonging to
     the Company, its successors or assigns, whether or not confidential. In the event of
15    the termination of my employment, I agree to sign and deliver the "Termination
     Certification" attached hereto as Exhibit C.
16

17    **D.    Barbacioru's Confidentiality Agreement With Guardant**

18    38.    Like Selewa, Barbacioru executed a CIIAA.  On September 4, 2017, Barbacioru

19    signed his Employee Confidential Information and Invention Assignment Agreement ("Barbacioru

20    CIIAA") with Guardant, the terms of which were similar to the Selewa CIIAA.  Section 1(b) of the

21    Barbacioru CIIAA states:

22    b.    **Company Confidential Information**. I agree at all times in
     perpetuity to hold all Confidential Information in confidence and to not disclose,
23    use, copy, publish, summarize, or remove from the premises of the Company any
     Confidential Information, except (a) as necessary to carry out my assigned
24    responsibilities as a Company employee, and (b) after termination of my
     employment, only as specifically authorized in writing by an officer of the
25    Company. I agree to take all reasonable measures to protect the Confidential
     Information of the Company from falling into the public domain or the possession
26    of persons other than those persons authorized to have any such Confidential
     Information. Nothing in this Agreement shall prohibit me from disclosing
27    Confidential Information of the Company if legally required to do so by judicial or
     governmental order or in a judicial or governmental proceeding ("Required
28    Disclosure"); provided that I shall (i) give the Company prompt notice of such

Required Disclosure prior to disclosure; (ii) cooperate with the other party in the event that it elects to contest such disclosure or seek a protective order with respect thereto, and/or (iii) in any event only disclose the exact Confidential Information, or portion thereof, specifically requested by the Required Disclosure.

39.    Section 1(a) of the Barbacioru CIIAA defines "Confidential Information" as "all information and materials that are confidential, secret, or proprietary (whether or not technical in nature) related to any aspect of the business of the Company," and includes "inventions, innovations, improvements, research or development activities and plans, test results, product specifications, disclosures, processes, systems, methods, formulae, devices, patents, patent applications, trademarks, intellectual properties, instruments, materials, products, patterns, compilations, programs, techniques, sequences, designs, specifications, computer programs, source codes, mask works, . . . and any and all information concerning the teaching of sales, marketing, and operational techniques, marketing and purchasing formulae, development of product designs, pre-manufacturing product designs, and formats."

40.    Section 4 of the Barbacioru CIIAA states:

**4.    RETURNING COMPANY DOCUMENTS**

I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to the Company, its successors or assigns, whether or not confidential. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit B.

E.    **Selewa And Barbacioru Take Guardant's Trade Secrets On Their Way Out The Door**

41.    In the days before his departure from Guardant in January 2025, Selewa transferred approximately 90 files from Guardant's IT systems to a Google drive not part of Guardant's network and which appears to be a personal storage drive used by Selewa for his own purposes. These 90 files taken by Selewa contain Guardant's Trade Secrets as described above, including spreadsheets, presentations, and Word documents pertaining to critical project information for the MCD/MCED test currently in development at Guardant and other Guardant products.  While Guardant's IT department can determine, and has determined, that these 90 files were transferred

by Selewa outside of Guardant's network and to Selewa's Google drive, Guardant does not have access to and cannot access Selewa's Google drive or determine what happened to those files after Selewa transferred them.

42.    Barbacioru transferred **thousands** of files containing Guardant's Trade Secrets outside of Guardant's IT networks shortly before his departure from Guardant to Natera.  On or around January 27, 2025, Barbacioru moved approximately 6,500 files containing Guardant's Trade Secrets from Guardant's network to an external USB hard drive.  The files Barbacioru transferred to the external USB hard drive contain Trade Secrets such as those described in each of subparagraph (a)-(d) in paragraph 24 above and included source code to algorithms deployed in Guardant's oncology products.

43.    These transferred files included original source code for Guardant's oncology tests. Many transferred files concern Guardant's MCD/MCED assays—testing information used to determine the presence of ctDNA—that lie at the heart of the project.  Barbacioru also transferred Trade Secret files concerning virtually all of Guardant's other products (*e.g.*, Omni, Sirius, Phoenix, GH2.11, and Lunar 2), even though Barbacioru did not work on those projects and does not appear to have had any legitimate purpose or need to access those files even while working at Guardant. Examples of the file names of these Trade Secrets transferred by Barbacioru include:

01_Omni48_validation.R

04_gh2.10_validation.R

Omni1.0_probes.bed

Sirius_v1.2_ghcnv_addon_snp_params.tsv

Sirius_v1.2_probes.bed

Sirius_v1.2_gene_range.tsv

Sirius_v1.2_panel.bed

Sirius_v1.2_ghcnv_genes.tsv

Sirius_v1.2_ghcnvwg.json

Sirius_v1.2_blacklist.bed

Sirius_v1.2_mappability.tsv

Sirius_v1.2_cnv_germline_snp_info.tsv

Lunar2v0.2_TWIST_ghcnv_probes.tsv

GH2.11_ghcnv_probes.tsv

GH2.11_mappability.tsv

GH2.11_blacklist.bed

virus_detector.dvc

cnv_algo.dvc

44.     At and following his departure, Barbacioru failed to sign and return the "Termination Certification" required under the Barbacioru CIIAA.  Besides breaching that confidentiality agreement, Barbacioru's failure to sign this certification verifying he had returned all company property and had preserved, and would preserve, Guardant's confidential information raises serious concerns.  On February 8, 2025—one day after his departure—Barbacioru implicitly acknowledged he had failed to abide by the terms of the Termination Certification when he claimed he would ship back to Guardant its "company issued assets, laptop, badge, and phone." Barbacioru's statement is most notable for what he does not say.  He stated nothing about his transfer of 6,500 files, what he had done to them, what he intended to use them for, or whether he had retained those files or copies of them.

45.     Besides being described above, the specific Trade Secrets taken by Selewa and Barbacioru are readily known to them because, among other things, they signed CIIAAs in which they acknowledged files like those they transferred are protected, confidential information belonging to Guardant and were not to be removed from Guardant's systems without authorization. Selewa and Barbacioru also know the specific Trade Secrets upon which the claims herein are based because Selewa and Barbacioru actively and selectively transferred them outside of Guardant's network, as described above.  That Selewa and Barbacioru selected specific Trade Secret files to transfer and retain following their termination from Guardant further evidences the economic value and importance of the taken Trade Secrets.  Their decision to take these files on their way out the door to Natera strongly suggests an intent to use them to benefit their new employer.

1

2

**F.    The Theft of Guardant's Trade Secrets Was Part Of A Coordinated Effort To Jumpstart Natera's Floundering Blood Test Program**

3      46.    In the days before his departure from Guardant, Barbacioru openly told colleagues

4    he was leaving for Natera.  He further disclosed to colleagues that Natera was recruiting a large

5    number of bioinformatics scientists, including those from Guardant.  Barbacioru told these

6    colleagues that he was being hired by Natera to build a team to research and develop cancer test

7    products for Natera, although he did not disclose any details or specifics about what he planned to

8    work on at Natera.  Barbacioru also told these colleagues that his team would include former

9    Guardant employees at Natera, apparently in reference to Parsana, Ruiz, Goyal, and Selewa.

10     47.    Based on Barbacioru's statements before departing Guardant and his and Selewa's

11   actions in taking Guardant's Trade Secrets, Guardant is informed and believes and thereon alleges

12   that Selewa's and Barbacioru's actions were known to, encouraged by, and done for the benefit of

13   Natera.  Selewa and Barbacioru had no reason or purpose to take Guardant's Trade Secrets other

14   than to use at Natera, who would be the ultimate beneficiary.  Guardant is further informed and

15   believes and thereon alleges that Natera hired Selewa and Barbacioru specifically due to their work

16   on and access to Guardant's early cancer blood test products and their insights into those and other

17   Trade Secrets.

18     48.    The full scope of Defendants' scheme is not yet known to Guardant.  But the

19   wrongdoing discovered to date, as alleged in this Complaint, already has caused substantial damage

20   and harm to Guardant.

21                        **FIRST CAUSE OF ACTION**

22      **Misappropriation of Trade Secrets In Violation of Defend Trade Secrets Act**

23                        **(18 U.S.C. § 1836)**

24                        (Against All Defendants)

25     49.    Guardant repeats and realleges the allegations above as if fully set forth herein.

26     50.    The research data, source code, analytics, and other Trade Secrets described above

27   in paragraphs 24 and 41-43 are trade secrets as defined in 18 U.S.C. § 1839(3).  Guardant's Trade

28   Secrets are financial, business, scientific, technical, economic or engineering information (1) for

which Guardant has taken reasonable measures to keep secret and (2) which derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by others who can obtain economic value from the disclosure or use of such information. The Trade Secrets include formulas, patterns, technologies, and compilations of data used in Guardant's business and which give it an opportunity to obtain an advantage over competitors who do not know or use it.

51.    Guardant is the owner of the Trade Secrets described in this Complaint. The Trade Secrets were created, developed, compiled, and invented by Guardant, which has the rightful legal and equitable title to the Trade Secrets.

52.    Defendants misappropriated and are exploiting for their own benefit Guardant's Trade Secrets. Selewa and Barbacioru had access to the Trade Secrets solely by their positions at Guardant. Their access and use of the Trade Secrets was conditioned on and limited to the work they performed for Guardant's benefit and pursuant to the terms to the CIIAAs they signed. Selewa and Barbacioru misappropriated those Trade Secrets despite knowing their confidential, secret, and protected nature.

53.    As stated above, Selewa and Barbacioru transferred Guardant's Trade Secrets outside of Guardant's networks and onto storage spaces and/or devices not controlled by or accessible to Guardant. The only reason and purpose they could have for copying and taking Guardant's Trade Secrets after termination from Guardant would be to disclose and use Guardant's Trade Secrets in their new employment with Natera, which began promptly or immediately after they left Guardant.

54.    Guardant is informed and believes and thereon alleges that the Trade Secrets taken by Selewa and Barbacioru were received, acquired, possessed, and/or used by Natera after Selewa and Barbacioru became employed by Natera. Guardant cannot currently know the full extent to which Natera has employed the Trade Secrets as part of its research, development, or business but all of it is wrongful. Natera is not the owner of Guardant's Trade Secrets and has no right to access, disclose, or use those Trade Secrets in any way. Natera knew or had reason to know that Guardant's Trade Secrets were acquired by Natera through improper means.

55.     Defendants did not have the express or implicit consent of Guardant to remove the Trade Secrets from Guardant's network or to use or disclose the Trade Secrets to anyone outside the company.  Nor did Selewa and Barbacioru have the express or implied consent to retain the Trade Secrets after termination of their employment with Guardant.  In fact, the CIIAAs they each signed expressly prohibit unauthorized disclosure or dissemination outside the company or retention of such information after their departure from Guardant.

56.     Guardant is informed and believes and thereon alleges that Defendants misappropriated Guardant's Trade Secrets in a willful manner.

57.     As a proximate cause of Defendants' misappropriation of Guardant's Trade Secrets, Guardant has suffered and will continue to suffer actual damages, and Defendants will be unjustly enriched in sums not yet ascertained.

58.     To the extent Defendants are permitted to continue to misappropriate and possess Guardant's Trade Secrets, Guardant will suffer immediate and irreparable harm.  Such economic harm will be difficult to quantify.  Further, the harm will increase exponentially if Defendants disclose Guardant's Trade Secrets to others.

59.     The misappropriation by Defendants was willful and malicious so as to justify an award of exemplary damages, double damages, and/or reasonable attorneys' fees under 18 U.S.C. § 1836(b).

**<u>SECOND CAUSE OF ACTION</u>**

**Misappropriation of Trade Secrets In Violation of California Uniform Trade Secrets Act**

**(Cal. Civ. Code, §§ 3426 *et seq*.)**

(Against All Defendants)

60.     Guardant repeats and realleges the allegations above as if fully set forth herein.

61.     The research data, source code, analytics, and other Trade Secrets described above in paragraphs 24 and 41-43 are trade secrets as defined in California Civil Code section 3426(d). Guardant's Trade Secrets are financial, business, scientific, technical, economic or engineering information (1) for which Guardant has taken reasonable measures to keep secret and (2) which derive independent economic value from not being generally known to, and not being readily

ascertainable through proper means by others who can obtain economic value from the disclosure or use of such information.  The Trade Secrets include formulas, patterns, technologies, and compilations of data used in Guardant's business and which give it an opportunity to obtain an advantage over competitors who do not know or use it.

62.    Guardant is the owner of the Trade Secrets described in this Complaint.  The Trade Secrets were created, developed, compiled, and invented by Guardant, which has the rightful legal and equitable title to the Trade Secrets.

63.    Defendants misappropriated and are exploiting for their own benefit Guardant's Trade Secrets.  Selewa and Barbacioru had access to the Trade Secrets solely by their positions at Guardant.  Their access and use of the Trade Secrets was conditioned on and limited to the work they performed for Guardant's benefit and pursuant to the terms to the CIIAAs they signed.  Selewa and Barbacioru abused that access to misappropriate and exploit those Trade Secrets despite knowing their confidential, secret, and protected nature.

64.    As stated above, Selewa and Barbacioru transferred Guardant's Trade Secrets outside of Guardant's networks and onto storage spaces and/or devices not controlled by or accessible to Guardant.  The only reason and purpose Selewa and Barbacioru could have for copying and taking Guardant's Trade Secrets for their use after termination from Guardant would be to access and use Guardant's Trade Secrets in their new employment with Natera, which began promptly or immediately after they left Guardant.

65.    Guardant is informed and believes and thereon alleges that the Trade Secrets taken by Selewa and Barbacioru were received, acquired, possessed, and/or used by Natera after Selewa and Barbacioru became employed by Natera.  Guardant cannot currently know the full extent to which Natera has employed the Trade Secrets as part of its research, development, or business but all of it is wrongful.  Natera is not the owner of Guardant's Trade Secrets and has no right to access, disclose, or use those Trade Secrets in any way.  Natera knew or had reason to know that Guardant's Trade Secrets were acquired by Natera through improper means.

66.    Defendants did not have the express or implicit consent of Guardant to remove the Trade Secrets from Guardant's network or to use or disclose the Trade Secrets to anyone outside

the company.  Nor did Selewa and Barbacioru have the express or implied consent to retain the Trade Secrets after termination of their employment with Guardant.  In fact, the CIIAAs they each signed expressly prohibit unauthorized disclosure or dissemination outside the company or retention of such information after their departure from Guardant.

67.     Guardant is informed and believes and thereon alleges that Defendants misappropriated Guardant's Trade Secrets in a willful manner.

68.     As a proximate cause of Defendants' misappropriation of Guardant's Trade Secrets, Guardant has suffered and will continue to suffer actual damages, and Defendants will be unjustly enriched in sums not yet ascertained.

69.     To the extent Defendants are permitted to continue to misappropriate and possess Guardant's Trade Secrets, Guardant will suffer immediate and irreparable harm.  Such economic harm will be difficult to quantify.  Further, the harm will increase exponentially if Defendants disclose Guardant's Trade Secrets to others.  Guardant therefore asks for a temporary restraining order, preliminary injunction, and permanent injunction requiring the Defendants' return of Guardant's Trade Secrets, dispossession of all copies of the Trade Secrets, and prohibition on any further misappropriation.

70.     The misappropriation by Defendants was willful so as to justify an award of exemplary damages, double damages, and/or reasonable attorneys' fees under California Civil Code section 3426.3.

### THIRD CAUSE OF ACTION

### Breach of Contract (Selewa CIIAA)

(Against Selewa)

71.     Guardant repeats and realleges the allegations above as if fully set forth herein.

72.     Guardant and Selewa entered into Selewa CIIAA described above, under which Selewa was obligated to, among other duties, preserve and not disclose Trade Secrets and return all property, including confidential information, to Guardant upon termination from the company.

73.     Guardant fully performed under Selewa CIIAA, except to the extent its performance has been waived, prevented or excused by Selewa's acts, conduct, or omissions.

74.    Selewa breached the Selewa CIIAA by, among other things, (a) transferring Guardant's Trade Secrets and confidential information outside of Guardant's network without authorization, (b) retaining and failing to return Guardant's Trade Secrets and confidential information after his termination from Guardant, and (c) possessing, using, implementing, commercializing, and/or disclosing Guardant's Trade Secrets as part of his work at a competitor, Natera.

75.    As a proximate result of Selewa's breach, Guardant has been damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### Breach of Contract (Barbacioru CIIAA)

(Against Barbacioru)

76.    Guardant repeats and realleges the allegations above as if fully set forth herein.

77.    Guardant and Barbacioru entered into Barbacioru CIIAA described above, under which Barbacioru was obligated to, among other duties, preserve and not disclose Trade Secrets and return all property, including confidential information, to Guardant upon termination from the company.

78.    Guardant fully performed under Barbacioru CIIAA, except to the extent its performance has been waived, prevented or excused by Barbacioru's acts, conduct, or omissions.

79.    Barbacioru breached the Barbacioru CIIAA by, among other things, (a) transferring Guardant's Trade Secrets and confidential information outside of Guardant's network without authorization, (b) retaining and failing to return Guardant's Trade Secrets and confidential information after his termination from Guardant, (c) possessing, using, implementing, commercializing, and/or disclosing Guardant Trade Secrets and confidential information as part of his work at a competitor, Natera, and (d) refusing to sign the required "Termination Certification."

80.    As a proximate result of Barbacioru's breach, Guardant has been damaged in an amount to be determined at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CAUSE OF ACTION**

**Tortious Interference With Contractual Relations**

(Against Natera and Does 1-50)

81.    Guardant repeats and realleges the allegations above as if fully set forth herein.

82.    Guardant entered into CIIAAs with its employees, including the Selewa CIIAA with Selewa and the Barbacioru CIIAA with Barbacioru.

83.    Guardant is informed and believes and thereon alleges that Natera and Does 1-50 knew of those CIIAAs and/or the contractual restrictions they placed on Guardant's employees with respect to Guardant's Trade Secrets and confidential information.

84.    Natera and Does 1-50 interfered with these CIIAAs by intending to cause, and causing, Guardant's employees, including Selewa and Barbacioru, to treat Guardant's Trade Secrets in a manner inconsistent with their performance obligations under the CIIAAs, which disrupted the contractual relationship between Guardant and such employees.  In particular, the employees, including Selewa and Barbacioru, failed to preserve and protect Guardant's Trade Secrets and confidential information as required under the CIIAAs.

85.    Natera and Does 1-50's misconduct was a substantial factor in causing Guardant's harm.

86.    As a result of Natera and Does 1-50's misconduct, Guardant suffered damages in an amount to be determined at trial.

87.    Natera and Does 1-50's actions were committed with malice, fraud, and oppression, and with the intent to harm Guardant, as described above.  By their actions, Natera and Does 1-50 aimed to benefit financially at the expense of Guardant, including by inhibiting Guardant's efforts to develop groundbreaking technology and obtaining Guardant's Trade Secrets and confidential information for themselves.  Accordingly, Guardant is entitled to recover punitive damages in an amount to be determined at trial.

GUARDANT HEALTH INC.'S COMPLAINT

**SIXTH CAUSE OF ACTION**

**Inducing Breach of Contract**

(Against Natera and Does 1-50)

88.    Guardant repeats and realleges the allegations above as if fully set forth herein.

89.    Guardant entered into the Selewa CIIAA with Selewa and the Barbacioru CIIAA with Barbacioru.

90.    Guardant is informed and believes and thereon alleges that Natera and Does 1-50 knew of those CIIAAs and/or the contractual restrictions they placed on Guardant's employees with respect to Guardant's Trade Secrets and confidential information.

91.    Guardant is informed and believes and thereon alleges that Natera and Does 1-50 intended to cause Selewa to breach the Selewa CIIAA and intended to cause Barbacioru to breach the Barbacioru CIIAA by, among other things, encouraging and incentivizing Selewa and Barbacioru to transfer Guardant's Trade Secrets and confidential information outside of Guardant's network and to retain and use such information in their new employment with Natera.

92.    The misconduct of Natera and Does 1-50 caused Selewa to breach the Selewa CIIAA and caused Barbacioru to breach the Barbacioru CIIAA.

93.    As a proximate cause of those breaches, and Natera and Does 1-50's misconduct, Guardant has been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Guardant prays for relief and judgment against Defendants, as follows:

1.    For a temporary restraining order, preliminary injunction, permanent injunction, and/or other injunctive or equitable relief requiring Defendants to return Guardant's Trade Secrets and other property to it, prohibiting Defendants from using or disclosing Guardant's Trade Secrets or other confidential information, the complete dispossession by Defendants of all Trade Secrets and copies thereof, and verification as to the use, disclosure, and/or dissemination of the Trade Secrets at all times since Defendants' misappropriation;

2.    For general, special, and other compensatory damages suffered by Guardant according to proof at trial;

1        3.      For exemplary, double, and/or enhanced damages;

2        4.      For punitive damages;

3        6.      For Guardant's costs of suit and reasonable attorneys' fees;

4        7.      For pre-judgment and post-judgment interest at the maximum allowable rate on

5 any amounts awarded; and

6        8.      For any other and further relief as the Court deems just and proper.

7

8 Dated: February 20, 2025        **KELLER ANDERLE SCOLNICK LLP**

9                        By:  */s/ Chase Scolnick*

10                            Chase Scolnick

11                  Attorneys for Plaintiff

12                  GUARDANT HEALTH, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GUARDANT HEALTH INC.'S COMPLAINT

1

## **JURY TRIAL DEMAND**

2      Plaintiff Guardant demands a trial by jury on all issues so triable.

3

4    Dated: February 20, 2025          **KELLER ANDERLE SCOLNICK LLP**

5                                      By:  _/s/ Chase Scolnick_

6                                           Chase Scolnick

7                                      Attorneys for Plaintiff
                                       GUARDANT HEALTH, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GUARDANT HEALTH INC.'S COMPLAINT